Today is Brown v. Commissioner Social Security and Ms. Metcalfe, whenever you're ready, we will hear from you. May it please the court, I'm Hannah Rogers Metcalfe. I have the privilege to be here today on behalf of the appellant, Mr. Ricky Brown, in this Social Security appeal. And before I get into any argument, I would like to direct the court's attention to a recent decision from the District of South Carolina. It was not included in our initial brief because it is a recent opinion. It is Lydia v. Colvin. I just want to give the court that citation and then continue with my argument. It is an opinion from Judge Seymour and it is a September 28, 2016 decision, 2016, District Lexis 13-32-71. I point the court to that decision because it echoes Judge Gergel's decision in the Creekmore case, which is cited in our brief. And I'd like to focus the argument today on the contrast between Judge Norton's opinion in this case and Judge Gergel's decision in Creekmore. Because the two cases reach different results but have the same facts and the same procedural posture. And it's important. In looking at this case, one needs to look at the case as a whole. And when you look at this case as a whole, you can see that the ALJ failed to properly weigh the opinions of the treating and examining medical sources against that one opinion of a testifying expert, Dr. Jonas. And in the Creekmore decision, Judge Gergel concluded that the ALJ's reliance in that case was improper. His reliance on the testimony of Dr. Jonas was improper. And when they used this medical expert testimony to disregard and violate the treating physician role with regard to the opinions of treating and examining physicians. Dr. Jonas has been around a little bit. Dr. Jonas has been around quite a lot, Your Honor. And that is what Judge Seymour in the September opinion also noted. And I commend that opinion to the court as well as the underlying report and recommendation, which spells out in greater detail. You said you got a split in the district. Yes, Your Honor. We have a split in the district. Three judges have weighed in or more than three? Two judges have weighed in. Three? Sorry, three have weighed in. Who do we have here? Here is Judge Norton. Judge Norton and Judge Seymour and Judge Gergel that you mentioned already. Yes, Your Honor. That's correct. And our position is that Judge Gergel and Judge Seymour have reached the right conclusion. And to the extent Judge Norton did not, I'm sure that's my fault. Dr. Jonas has an office somewhere out west and he reviews the files and talks on the telephone when you have hearings? That's right, Your Honor. And he always says that there's no disability and testifies against the claimant? That is correct. He is a psychiatrist testifying out of Miami. A review of the record in this case demonstrates just the morning of this hearing he had three back-to-back hearings. He couldn't even keep it straight on the telephone call which case he was testifying in. He had another hearing with the same ALJ in this case later on in that day. So he's never treated anybody, he just looks at the file? In none of these cases that I could find and in none of the cases Judge Gergel pointed to was he a treating or an examining. Never did he examine the patient, he just looked at the file. But in this case, you say you have treating physicians that he contradicted? That's correct, Your Honor. And the treating physicians and the examining physicians are all internally consistent. Every treating physician and examining physician, Dr. How many of those are there? There's two truly treating physicians, Dr. Worsham and Dr. Greer. Both say that pain here is present to such a degree as to be distracting. He is also seen by examining medical source individuals, Dr. Tolleson, who issues a lengthy report after conducting tests and says the same thing. He concurs that this individual will be distracted by their pain such that they could not concentrate or maintain his attention over a full workday. Dr. Burnett, who also says not be able to work due to the pain and the distraction of the pain. You know, if you look closely at the record, the doctors that you advanced relied mostly on the subjective complaints of the plaintiff in this case. And I noted that to one or two doctors he complained about his right shoulder. To a couple of other doctors he complained about his left shoulder. In his first testimony, he said, it's my left shoulder. Any problem with your right shoulder? No, nothing. It's working fine. And the second time he testified for the same ALJ, he says, it's my right shoulder. It's not my left shoulder. And then finally the ALJ asks him, well, what shoulder is it? And he says, well, it's both shoulders. But he never complained to the doctors about those. And then he takes this peg test that he fails and basically can't put the pegs in. They give him almost complete inaction with the fingers. Both the shoulders and the fingers are the real barrier to doing work. And yet the record shows from his own testimony that, you know, he writes his own checks, he collects coins, uses a magnifying glass, he uses a computer, microwave, he shops, he drives his automobile, he shaves, he brushes his teeth and can carry 10 pounds. These are all things he's agreed to. Yet the doctors have concluded he can't do any of those. Two doctors, I think, said he can't take care of his own mental hygiene. He says, I can do all that. And he says it explicitly, I can take care of that. He says, I have to sit down when I shave because he gets tired of standing up. He does his shaving and showering and whatever. And so I think the ALJ is confronted by the question of can this guy work or not? And to me, in reading this, there seems to be quite a consensus about his back problem, his pain. But about the aspects that really deny him the ability to work, which would be his fingers and his arms, it's all subjective. They took x-rays and couldn't find anything wrong. And then you have all his statements about what he did and then you have these differing statements, he says to different people, which shoulder it is. When you look at that, the opinion may not be perfect and Jonas is clearly not perfect. I think Judge King is focused on the real problems of Judge Jonas and I don't think that's a good practice. We see that also in black lung cases where we have the same people testifying again and again. But I must say when you look at the objective evidence, it's hard for us to conclude that the agency didn't have sufficient evidence to reach the conclusion it did. Your Honor, I'm going to sort of unpack a little bit of that objective evidence if you don't mind. Any way you want. I gave you a lot. And I think that your recollection of the record with regard to his shoulder is correct and your recollection with regard to the fact that he does drive down the road to his mama's house. 50 miles he drove. It's about an hour's drive he drove. He doesn't have any trouble driving and he's never complained about it. Well, the record actually says... He says a lot of short trips. He goes shopping and he drives here and there. But he also talked about driving 50 miles on a trip. I don't know where he was going for that. For a cousin or something? Your memory is better than mine. My recollection of the record is that he can drive the short distances. He drives, I think it's three miles to the post office. He can drive less than a mile to his mother's. But he states in the record in the testimony that after... Does that mean repairs on the car? There's one instance where he told a doctor that his pain was aggravated because he tried to go under his car to look at something. There's one instance. That's over seven years, Your Honor. I understand, but the record is filled with this type of stuff when at the very same time he's telling the doctors and he's doing these tests that are based subjectively on what he says. I have pain here. I can't move this shoulder. I can't even use this hand. Then they ask him, how about the other hand? He says, oh, that's fine. Then he flips it. Then he tells the doctors this. I find it hard to say he picks up coins and he uses a magnifying glass and he writes out his own checks and he uses a computer. He doesn't like the mouse, but he does with the finger. Type like an Apple laptop. And it doesn't ring right, and it probably didn't ring right to the ALJ. Well, Your Honor, with regard to the record evidence and the objective record, I mean, there's a couple different things. I know you're talking about his shoulder and his hands, the objective findings. But he could sit. I mean, you know, if he's paralyzed from the waist down, he could sit and work with his hands. Same thing with his brain. You know, they question him about his skills and his math. He says, well, I got up to trigonometry. And he had an associate's degree with two years of post-high school thing. Yet the doctor seemed to say you would almost think he's illiterate. I mean, there is something not clicking in this case. And, of course, we don't sit there and look at the witnesses. And we do look at this evidence. But it has to be consistent. The medical has to be consistent with the objective evidence. We have no objective evidence on his shoulders or neck. They did take x-rays, did try to find something wrong. There was nothing wrong with it. If Your Honor, if I may correct you with regard to that, there is objective evidence with regard to his neck where they do show at C6 and C7 a bilateral facet hypertrophy, right greater than left. That's at record 269. So that's on his neck. From AMED Health, it's a radiology. What vertebrae is it? C6 and C7. It's a cervical MRI that was done on April the 4th of 2008. Is that Dr. McMillan's testimony? That is not Dr. McMillan's. That's an addition. Pardon? That's an addition, Your Honor. Dr. McMillan was on MRI, wasn't he? Dr. McMillan is not a radiologist. It's on an MRI. But he is a pain specialist. And he is examining not his neck, Your Honor, but his lumbar region. It is his L4 and L5. And his opinion, and this is an opinion. He's offering a diagnosis, a prognosis. He's talking about what's going on here. And he has been referred to Dr. McMillan. Dr. McMillan actually looks at the MRI, does a physical exam of this gentleman, and says that the MRI documents far right laterals, that's lower back, disc herniation, and pyramidal compression of nerve root at L4 and L5. There's pretty much agreement on problems down there, aren't there? That's right. The record is consistent. There's no one that disagrees, with the exception of Dr. Jonas, who says, I don't see this. And this is what his testimony is, and all these cases he testifies in, and that's what the Lydia case, Judge Seymour, and Magistrate Judge Shiva Hodges points out. This is what he says all the time. He comes in and says, I don't really see this. This case arises from consideration of how social security cases work. It arises under the way it's actually set up under the Code of Federal Regulations. And particularly when you get it to a doctorate degree, who tells you straight up, that gets controlling weight, unless you can tell that the clinical diagnosis is something wrong. ALJs are not doctors, nor are the judges up here on these courts. And whether it's subjective or objective, back pain, for the most part, is subjective. Pain is a subjective determination. And to do what was done here, you've got to say, these doctors all those years of schools, and the fact that you went to several of them and you got a bunch of them, I'm going to give this psychiatrist who got on the phone and called me more credit than I'm going to give them. That's the problem you've got in here. Not whether or not we agree with it or disagree with it, social security cases are pretty straightforward. And when you've got a line of doctors that say here, and they have clinical facts, Dr. Adams, who was the vocational expert, he said I looked not only at the, not just in terms of what he's saying, the subjective pain, I looked at physical limitations on it. He's an expert. This is what he does. And unless the government pulls something else to weigh against that, other than someone who calls on the phone, I don't see how you get to the point of, well, he just said he was hurting me. They were just these doctors. It's like you're talking about a bunch of quacks. These are doctors. These are medical doctors who have been treating this man for a long time, and they are the treat physicians, and the Code of Federal Regulations lays out how to weigh that testimony. You cannot deviate from that unless you can come up with some reason to say their clinical diagnosis or analysis and the research that they've done and how they've gone about this, because they can spot somebody who is faking it, so to speak. That's part of their job. That's exactly it. They do this all the time. That's exactly it, Your Honor. These doctors who examined him, saw him, who are doctors, they all agree. They rely on these MRIs. There's the doctor in 2006 who first sees him, the neurosurgeon, who says, I see. If it wasn't subjective pain, you would probably never get into one with a back pain, any type of social security disability, because he is telling you where he's taken. That doctor cannot objectively verify most cases if, in fact, there is pain. He can only tell you based upon his diagnosis. Is it consistent with my clinical diagnosis? Is it consistent with what you're saying? And that experience and expertise of the year yields the result on that, not you just telling me pain and ALJ says you're not really in pain. You just say it because you can drive or you can do these things one or two times. And it doesn't work that way, because there's a grid that tells you how to do it under CFR, and there's a grid that tells you from a vocational expert of what type of job you qualify for, and if he says no, in every case I've seen in the real practice out there, you're kind of on good grounds. If he has gone to that type of people, they'll find every kind of job in the world for you to do. When you get to that point, it's a pretty high level to come back and say, but this case is about weighing the opinions, and here the ALJ for some reason weighs Dr. Jones' opinion, which even if he didn't do it from Judge Meadmire's perspective, which I certainly respect in terms of where he's going with it, you don't need Dr. Jones to get where he's going on it, because he's saying these doctors just don't know what they're talking about. They're being bamboozled by this doctor. The courts are smart enough to figure out he's being bamboozled by ALJ, but the doctors, with all their medical training, we're going to just say you don't know what you're talking about. We're only going to give you limited weight or no weight. I don't follow that. I can't follow it in the social security case. They don't go that way. No, they don't, Your Honor. Normally this case wouldn't be here. From what I can see, I haven't seen anything here while this case is here. Do you have any?  Again, I urge the court to follow Judge Bergo's. I just want to say thank you, Judge Meadmire. Thank you. I'm hoping they'll decide to go to light. Ms. Curry, we'll hear from you. Good afternoon, Your Honor. It sounds like I foreclosed your argument. I did not mean to do that on this, but I do want you to speak to those points that I'm making in terms of the weight of the doctor's testimony in light of the CFR and what was done here by the ALJ. He'd already been sent this back once. If he does it, he needs to come back and do the process. I certainly will. May it please the Court, Melissa Curry for the Commissioner of Social Security. As Your Honors are familiar, substantial evidence is not a demanding standard. It requires only that the ALJ's decision be supported by more than a mere scintilla and somewhat less than a preponderance of the evidence. Before directly addressing those points, I just want to take a step back to briefly discuss the opinion itself. ALJ Wilson issued an exemplary 25-page decision that more than satisfies the substantial evidence standard, and it amply provides for a meaningful judicial review. The decision thoroughly evaluates each impairment, each medical opinion, and the basis for finding that Brown could perform a limited range of sedentary work prior to his 2011 date last insured, which is also an important point because some of the evidence post-dates that date last insured. But he ignored Dr. McMillan. The ALJ did discuss the MRI findings elsewhere in the decision,  There's nothing in that note that suggests any specific functional limitations that the ALJ could have included in the RFC assessment that would have changed the ultimate decision. And as the district court said, it's inconceivable that having this case sent back for the ALJ to discuss that note would have changed the decision. So you're arguing harmless error? To the extent it could be considered error, it wouldn't have changed the outcome, so it would be harmless. You do argue harmless error? I don't. We get a lot of that up here at the government. Usually it's in criminal cases where they put somebody in penitentiary and they say, well, we may have made a mistake or two, but it's all harmless. So I mean, I'm not saying it doesn't apply. In this case, I don't think it's. But you're very careful. ALJ missed it. He did not discuss that particular note, but he was certainly aware of the MRI itself. Again, he didn't find that Mr. Brown had no limitations whatsoever. He found him very significantly limited. As Judge Niemeyer was discussing, there is a significant amount of evidence that conflicts with his allegations that he was totally unable to work. How do you deal with this Dr. Jonas issue? Calling on the telephone, as Judge Lin has talked about. Certainly, a couple of points to that. Introducing it with some other case and saying that all ten of the reading, examining doctors didn't know what they're talking about. Well, speak to that in the context of the weight to give to the testimony. Certainly, there can be conflicting evidence here, but the weight that you accord to the physicians here, as well as the person who's calling in, Dr. Jonas, that's the question. The question is substantial evidence from what, based upon the weight that you accorded the individuals here, and what was the basis for you according that weight in light of CFR? Sure. Well, first I wanted to point out that it doesn't matter whether all of the opinions that a claimant presents agree with each other if they aren't supported by the evidence underneath. And again, I think it was mentioned earlier. If they aren't supported by the evidence? The underlying evidence in the record has to support the opinions that Brown is claiming agree with each other. The fact that he has a certain number of opinions that seemingly agree with each other, saying that he can't work. So if the doctor gives an opinion, you're saying the evidence that the doctor used to support that opinion must support his opinion. That's what you're saying, that the opinion must be supported by it? Yes, and that's in the regulations. That's correct. But in terms of the weight to accord that doctor's opinion that arises from the CFR, if it is a treating position, more than likely you give it a controlling weight unless you find the clinical basis for some other type of strong. More than just I disagree is subjective. There's got to be something there to say, you've got to say this doctor doesn't know what he's talking about. That's pretty much what you've got to say. Or in this instance, he didn't know what he was talking about because he went through all these tests and whatever he's doing here, that didn't mean that this man was bamboozling. I wouldn't use that word. If it's a treating position of the type that CFR speaks specifically to, the treating position. Yes, and treating positions are generally given greater weight. Controlling weight. Yes, but in this case, there is significant substantial evidence that supports a decision to give them less than controlling weight, and that's thoroughly evaluated in the ALJ's decision. So with Dr. Greer, why would you give him less than controlling weight? Dr. Greer's statement. Dr. Greer had a couple notes in his own treatment notes stating that although his pain wasn't completely relieved, he did feel like medications were quite helpful. He had started a walking regimen in 2010. Dr. Greer noted a modestly antalgic gape with no limp and no deficits. Dr. Greer's 2013 opinion also doesn't state that it is retroactive prior to the 2011 date last insured. And in the other physician's records, there are also notations that he was responding well to pain management. He was only treated with medications. He received injections, which reportedly resulted in marked improvement. He never had surgery that was actually recommended by Dr. McMillan. So in light of those facts, that would constitute substantial evidence. You know, when you're dealing with, and this is where it gets difficult for me at least, you talk about the opinion of Dr. Greer. He's gone through this. He's given us all these different types of tests and all that's there. ALJ, no medical training I'm sure, probably maybe some, gives an opinion. Well, this all adds up to something less than what it is. Doctor, it would seem like if this is going to come about, you'd have somebody on the other side who has also treated or at least examined this individual and says, no, I'm looking at this and I have a different opinion on it. And that's sort of the nerve of where we are. Everything you're saying is fine, but if we're going to basis that this is not adequate, you don't need Dr. Jones because basically from your perspective, it's all information that's not supported by evidence even though Dr. Greer says it is. Right? that the ALJ discussed enough was sufficient to overcome the presumption that a treating physician would get controlling weight. And Your Honor is correct that based on the evidence that the ALJ discussed, Dr. Jones' testimony wasn't even needed in this case. But if you look at the range of opinions in this case, we have treating and examining physicians say essentially that he cannot work. Dr. Jones saying, I don't think his limitations are quite that severe. The ALJ gave Dr. Jones' opinion or testimony persuasive weight to the extent that he wasn't totally disabled. What medical evidence is ALJ relying on? He's relying on a significant amount of evidence including the daily activities, the conservative treatment, treatment notes not documenting any loss of sensation. All from plaintiff's experts. Correct. That is all in the treatment notes. So he is reevaluating their testimony without the benefit of somebody helping him to do it. Because you say he doesn't need Dr. Jones because Dr. Jones is not even there. He's just looking at a record. He doesn't need that. He's there. He's like another expert sitting there looking at it saying, oh, Dr. Jones, you've got this all wrong. This does not mean this. This is different. The role of the ALJ is to look at all the evidence. But he needs some help to do it. Evidence has to support what he's doing. He certainly does. He has that deference with it. Social Security cases are somewhat different on that. I mean, you've got the substantial evidence, but it's the weighing of it, and that's the issue here. What weight he has according to this. He's one of the few who's according to this. No weight, limited weight to the plaintiff's line of experts, and Dr. Jones gets persuasive weight. Well, as I was saying before, he gave Dr. Jones's testimony persuasive weight to the extent that Mr. Brown couldn't do ñ he wasn't so limited that he couldn't do any work. But if you look at the actual RFP. Did he ever say that I don't need Dr. Jones? He did not say that. To come to this ruling. He did not say that. So he didn't find any or preclude any alternative. No. That Jones wasn't that sure? No. But if you look at the range of testimony. Did he get into this left from right? It doesn't mean I was discussing. The fellow didn't know he was left from his right. In Dr. Jones's testimony? No, no, no. You were ALJ. He did. That was. He was impressed with the fact that he didn't know he was left from his right. It was included in his discussion of inconsistent allegations. I remember. That's what caused me to remember. When I went in the military. You couldn't tell you were left from your right? In boot camp. All the time. The drill instructors screamed at us. For not knowing our left from our right. Your other left. You dumb SOB. Your other left. That's what they said. All the time. And these are young men who have been out of high school. Screaming at them for not knowing their left from their right. You're talking about people I grew up with. I'm talking about them. Some of them don't know their left from their right. That's the evidence that favors them. Except that wasn't the testimony. The testimony is he understood the left from the right. It might have been. It might have been. All you all are talking about is he said left, right, left one time and right the next time. And either he didn't know the difference. It could have been he didn't know the difference. It could have been that both of them were hurt. I don't know. I don't know that the ALJ knew either. Because I don't think the ALJ probably knew much about who he was dealing with. Well, but that wasn't the only basis for the ALJ's decision. He looked at the record. I don't know what Judge Wynn's experience was in the military. He was in the military a lot longer than I was. But I vividly remember the people that didn't know their left from their right and they were soldiers for the United States. It would seem to me that if that were the case here, first of all, this is a college. I don't know that that happened here. I don't know that that happened here. But running this guy down on that account bothers me. Well, that is documented in his treatment records, that he was making different complaints about different parts of his body at different times. To differing degrees. Correct. And the tests showed differently. Correct. And his daily conduct, which he confessed to doing and explained what he was doing was inconsistent with what he told the doctor. That's correct. And, again, it wasn't just one of these things that the ALJ relied on to find that the opinions were worthy of giving less than controlling weight. Well, you said he did rely on it. Not by itself. He didn't rely on it to impeach these doctors. As one small point in the program. And you want to use to say there's enough evidence there, even if you don't believe Dr. Jones or don't rely on Dr. Jones. There's enough there anyway. Because he doesn't know his left from his right. The state agency physicians also opined that he could perform a limited range of sedentary work. But, again, if you look at the RFC itself, it is extremely restrictive. Sedentary work, which is the lowest level of work that can be performed, an explicit limitation to performing only one to two-step tasks due to reduced concentration due to pain. So the ALJ wasn't making a finding that this gentleman had no pain. He very well recognized he had extremely significant pain. And the ALJ also explicitly stated that, although the decision focused on evidence that was inconsistent with Mr. Brown's claims, he was fully aware of other positive findings, such as straight-leg raising tests and hand weakness, but that the extremely restrictive RFC still accounted for those limitations. And just going back to Judge Jonas, excuse me, Dr. Jonas' testimony, the medical regulations do explicitly permit an ALJ to consider medical expert testimony, as does the law of this circuit. The Creekmore decision itself, with respect to Dr. Jonas' testimony, ignores the fact that administrative hearings are not adversarial proceedings. They are inquisitorial. So when the medical expert is brought in after a case is remanded, it's because that is the only expert in the record who has seen the entire evidence before him. That's something that the treating physicians don't have the benefit of. They're not brought in for any particular result, and I think it's very important to note that the courts would never see a case where Dr. Jonas is brought in to testify and benefits are affirmed, because the claimants would never appeal that. The other cases, as fully discussed in the brief, are very different from the facts in this case. Those involve mischaracterization of testimony, failure to acknowledge treating physician notes, and it's the commissioner's position that those are not present here. And the fact that he was a psychiatrist was actually very appropriate in this case, because Brown's main argument seemed to be that his concentration was limited due to his pain. That would be a mental impairment, so it was appropriate to have a doctor who had a medical degree and then specialized in psychiatry to testify as to that. What was Judge Gergel's view of Jonas? How did he criticize this? Judge Gergel believed that Dr. Jonas was brought in specifically to counter all of the other physicians in the record. And, again, that's just a misunderstanding of the nature of these proceedings, because it's not plaintiff versus defendant, expert versus... Dr. Gergel's misunderstanding. Judge Gergel, yes. Judge Gergel. In the Creekmore decision. Judge Gergel just misunderstood. I believe he mischaracterized the nature of... Judge Seymour just misunderstood. I'm not familiar with that case, so I can't speak to it. Judge Gergel cited about 20 cases in one footnote. Correct. And in none of those cases was there any finding of bias on the part of Dr. Jonas. And I see my time is up. Thank you. Next slide. Before I begin, I want you to know that I cannot tell my left from my right, and I can still remember my first-grade teacher swatting me with a ruler. But you don't think this record supports that type of confusion, do you? Your Honor, I'm not a doctor. No, I was reading the testimony. I've read the testimony in this case. And when he testified the first time, he's testifying and he said, it's my left shoulder that's hurting. And he was then asked, how about your right? It's fine. And then when he testifies the second time, he flips in the same type of question and it's explicit. And then the ALJ says, well, you told me the left shoulder the first time. Instead of saying, oh, I must have been confused. It is my left. He said, oh, it's both. So the question is, that doesn't show confusion. Besides, now he's just changing his position for the third time, which is saying it's both shoulders. And that's just one incident. I mean, there's incidents about the hygiene that he couldn't take care of himself, the PEG test, the various, I mean, the walking regimen. Even his treating doctor talked about he was walking and doing his. This talks about how far he has to walk to go to the mailbox. He says, one time he says, oh, it's a long way. The next time he says, oh, it's not long and I can't walk any farther. I think 200 feet one time, 100 feet the next time. That could be an error of estimation. But still, the notion you get from hearing him and reading his testimony is that he is exaggerating or trying to state what he thinks will help his case and not reacting perfectly to the real circumstances. And there is objective evidence. And the question in this case isn't whether to reject the doctor. The question is the doctor says he can't work. The doctor is now making a conclusion that the social security agency should be making, that he can't work because there's a whole standard for why he can't work. The question is, what's the extent of his pain? What's the extent of his disability medically? And how does that then translate into the workplace? Yes. But it's also helpful to know that in the context of his testimony, he has severe mental impairment. That's correct. And to hold him to testimony on a stand in the sense that if that is true, it seems like to me this is not just a regular guy getting up and giving. He has severe mental impairment together with what the doctors say pain and other disabilities. So he makes a mistake on left and right. He makes a mistake as to which side. He has severe mental impairment. That's evidence of it, too. That's exactly right, Your Honor. So you think he made a mistake then when he responded and said, oh, it's both? Well, I think the record reflects as time progresses, his impairment gets worse, and the pain gets worse in his shoulders. I have about a minute left, and I would like to just clear up one thing from counsel's statement with regard to Dr. Jonas and Creekmore. And I was counsel on Creekmore as well, so I'm a little bit more familiar perhaps with Judge Gergel's decision there. Counsel stated that Jonas was brought in to help because he could then have seen the entire record. That's not the case here. Dr. Jonas states in his testimony that he's not familiar with the entire record. He didn't listen. He didn't review the transcript from the first hearing. So this issue about the shoulders, Dr. Jonas isn't familiar with it. He didn't review the transcript. He didn't listen to the testimony at the second hearing. He says he doesn't have the full file. He says he hasn't read Dr. Tolleson's opinion. And he only says he has the F exhibits. And if you look at this case, it's gone up and down. There are a lot of exhibits. There's E exhibits. There's F exhibits. He didn't review all those. So he doesn't have the full longitude. He doesn't have the full case. The important thing in this case is that you have the improper weighing of an expert opinion of Dr. Jonas after he phones in from Miami and has sort of looked at some of the record but not all of it, and the court is using that to challenge the opinions of the treating and examining physicians. At JA-26, the court says, I'm going to go with Jonas. At 32, he says, I'm going to give limited weight to heartness because I'm relying on Jonas. At 33, the court says, I'm going to give limited weight to Tolleson, and I find the testimony of Jonas persuasive. At 34 and 35, he says, Worsham, he's the treating doc but not controlling. I find Jonas more persuasive. At 35, he says, I'm going to give limited weight to Greer, a treating physician, because based on the testimony of Jonas. At 36, he says, I'm going to give Burnett little weight. And at 38, he says, I'm going to give Dr. Keith limited weight because I've relied on the opinion of Jonas who reviewed all the evidence. That's the error in this case. And he doesn't even mention Dr. McMillan's opinion, which he doesn't weigh. That's the error. He relies on this hired gun, and that's what Judge Girdle called him in Creekmore, and that's what Judge Seymour says in the Keith decision, and they use this hired gun to improperly weigh and apply regulations and the case law from this circuit to dismiss all these other consistent opinions. Thank you. Thank you. We'll come down and brief counsel. Return to court for the day, please. This honorable court stands adjourned until tomorrow morning. Godspeed to the United States and this honorable court.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.